Mr. Palmer Good morning, Your Honors. May it please the Court, I am Bobby Palmer, representing Deputy Spicher in this particular action. As the Court has already determined, I'm sure, this is a case that involves a tragic situation and heart-wrenching facts involving a 14-year-old who hung himself in November of 2014 from a tree near his home. I'm sure the Court has already determined, based upon looking at the briefs, that the mother of the young child eventually found him, and essentially, after the child was cut down from the tree after several minutes, neighbors arrived to the scene separately and started performing CPR on the child. The deputy, in this case Deputy Spicher, arrived on the scene, and he's trying to assess the situation, and he, in fact, reasonably believes that this child is already deceased. Kennedy How could he reasonably believe that if he didn't even – if the – again, this is on summary judgment, so we have to accept the facts contrary to your position. How did he didn't even examine the decedent, Anthony? Spicher Well, as Your Honor knows, this deputy, from his standpoint, did check for Kennedy I know, but we can't accept that. We've got to accept the plaintiff's version that he didn't check. So, I mean, on this record, how could that possibly be a reasonable determination that he's deceased? Kennedy Well, Your Honor, other witnesses, if you look at the evidence in totality and even in the light favorable to the plaintiff, there are other witnesses who also believed that this particular child was deceased. Breyer But there was other witnesses, one of them, I don't know whether it was Karen Van Ness or Timpson, who said that there was a pulse detected, and he dismissed that and said, well, that's because you're doing CPR. So we've got – I don't know how this case would turn out on a trial, but I'm just looking at the summary judgment standard, and it's just hard for me to see how you could conclude that it was a reasonable determination that this – that Anthony was deceased. Kennedy Well, there are other witnesses, including a woman by the name of Christina Timpson, who called 911. She thought the child was deceased. The paramedic who came on the scene, and this is undisputed, the paramedic who came on the scene gave this trial a Glasgow coma score consistent with a deceased person. Breyer But the problem is you have evidence that supports the belief that he might have been deceased, but the question – but you've got this other evidence to the contrary, and on a summary judgment, we really worry about the evidence that's contrary to your position. Kennedy Well, Your Honor, I think what's important for purposes of a qualified immunity analysis, one looks at the – what the facts were from the standpoint of the defendant, and the defendant, I believe, reasonably believed that the trial was deceased. And from there, the issue before this Court is whether or not Gregory Speicher's actions violated the due process clause of the 14th Amendment by temporarily ceasing CPR on Ybarra. Because let's keep in mind, it's undisputed that once Deputy Speicher told the bystanders to stop CPR because he believed the trial was deceased, the paramedic was already coming on to the scene, and they passed each other coming out of the bush, so to speak. So with regard to the court – the district court's analysis of qualified immunity, the district court first determined whether or not Deputy Speicher was acting within his discretionary authority as a police officer. At the summary judgment stage, Appelli did not contend that Deputy Speicher was acting out of his discretionary authority. And, in fact, they conceded that he was, and so did the appellant concede that he was acting. Let me get you to the issue that is of concern to me. It seems like to me— I'm sorry, Your Honor? I'm introducing what I was about to say, shifting you just a little bit. It seems to me the Hamilton case is your best argument, and it holds in a very similar situation that reckless rescue attempt or interference with a bystander's rescue attempt does not, is not clearly established. In other words, you've got to have more than recklessness. Even though that is favorable to you, is it not true that the next level of culpability that the plaintiff would have to prove is intent to cause harm? And if the jury on remand could find on this record an intent to cause harm, then the district court's judgment denying qualified immunity would be affirmed and probably instruct suggesting to the district court that on remand before the jury, the jury would be asked to decide whether or not Speicher had an intent to cause harm. Your Honor, I hear what you're saying. The — there is no evidence at the summary judgment stage that Speicher, in fact, had any intent whatsoever to harm this child. And even the appellee has not raised that issue. You say there's no intent, but the law is clear that if an officer states a reason which could be pretextual, that a jury could then infer that there was a culpable intent. And the reasons that the officer asserted here of taking control of a crime scene, it seems to me that there's enough evidence on a summary judgment that a jury might disagree with that. Number one, because there was no crime scene. Number two, because there was a lot of anguish and concern, but there was no threats of violence or anybody fleeing or shooting anybody or hurting anybody. And so the anguish is completely understandable with the circumstances. So under that doctrine that you could infer a culpable intent from a false profession of intent, a statement that I'm investigating a crime scene, which there was no crime, and trying to get control of it, and there was nobody threatening anybody or trying to flee, that that might be enough evidence to get past summary judgment, again, not saying it's enough evidence to win. What's wrong with that? Well, Your Honor, first of all, with regard to the undisputed facts for purposes of summary judgment, Deputy Speicher is arriving on the scene without 20-20 hindsight, not knowing what the relationship is between the bystanders and the trial. There are two knives in the vicinity. Yeah, but nobody's holding those knives. They're just on the ground. And if he wanted to do an investigation, he could have asked, well, what are those knives for? And somebody quickly would have said, we cut him down. In fact, he probably could have inferred that because he could see that the rope had been cut. So nobody was picking him up or making any aggressive move. I don't see that that advances any evidence of threat. Well, Your Honor, we have argued in our brief that it was a chaotic situation. It was. People were distraught, obviously. But how did the distraughtness get addressed reasonably or unreasonably or in any way within the law by refusing to allow efforts to try to bring the spoil, save his life? Well, Your Honor, this is an issue neither raised by the appellee nor raised by the district court. I understand Your Honor's inquiring about it, but there's absolutely no evidence whatsoever that there was some. Well, like Judge Ebell, I want to hear from the plaintiff about what the plaintiff says about evidence of intent to cause harm. But we do know that he was, Speicher was given two extra chances. One, I think Karen said she felt a pulse, and there was a second that I can't remember chance, and he nevertheless reiterated his command. And Speicher had CPR training. He was an EMT at one time. Is that not true? He was a medical technician at one time. Right. And therefore, he would be presumed to know that you're not supposed to stop CPR unless I would guess the standard might be 100 percent sure that it's futile. And the fact that he did not examine the victim, Anthony, at all, why couldn't a jury find intent? I suppose the jury could do whatever it wanted to, Your Honor, but there would be no evidence whatsoever, as far as I know, now or at trial, that this deputy had some intent to harm a child he'd never met that he believed was deceased. Your Honor, this — whether this case — And his sympathetic comment to the mother would support, but I'm not sure. It's not a jury question. I interrupted you. You were about to say something. Our time is up, but I want you to finish your thought. Your Honor, I was just going to say that, you know, whether or not, as the Court knows, whether or not deputies voucher violated some standard of care for purposes of a State law negligence claim is not what we're here for. This case, the issue is, would this case and the facts thereof rise to the level of this circuit determining that what Deputy Speicher did violated the due process clause of the Constitution? We have argued — That shocks the conscience. I'm sorry? The test for executive abuse of the due process clause is shocks the conscience. So that's the question, right? Yes, Your Honor. Okay. Thank you. And our position is that look at the Hamilton case. In 1996, this circuit, on very similar facts — the child was even 14 in that case — with very similar facts, this particular circuit determined that that deputy was entitled to qualified immunity. And I would assert, Your Honors, that with all due respect to the District Court, the District Court erroneously determined that Deputy Speicher was not entitled to qualified immunity. But, of course, Hamilton was decided under a different rule of what has to be proven. They dealt with State-created danger and special interests, not the present rule for a due process violation. But I see your time has expired for now. I recognize that the rule has changed. But the rationale this circuit used in Hamilton in 1996 to determine a deputy who stopped CPR on a 14-year-old was entitled to qualified immunity, that rationale is still valid today. And the District Court simply would not have — simply did not even consider Hamilton at all when, in fact, it is the case — the one case that has very similar facts. And this — this deputy in this situation should have qualified immunity if the law was not clearly established that what he was doing violated the Constitution. I think we understand your argument, and we will give you your entire rebuttal time. Thank you. Ms. Carlin. Good morning. May it please the Court. My name is Tracy Carlin. And along with Carlos Velazquez, we represent Jolene Waldron, who is the mother of Anthony Ibarra and also the personal representative of the estate. In the — having listened to the appellant's arguments, there's a couple factual things I'd like to clear up. First off, he said that there were other witnesses who believed that Anthony was deceased. And he mentioned Christina Timpson. If you listen to the 911 tape, she repeatedly tells the 911 dispatcher that she thinks the boy may be dead, but she can't see him because he's under this large live oak tree and his — and her husband, who was the first one to cut the kid down and do CPR, would not let her back there. So she couldn't see the kid. She was making assumptions based on what she understood the facts to be. And there were plenty of other people who testified that they did think he had the potential to survive this incident because he was warm to the touch when Mr. Timpson first cut him down. Mr. Timpson thought he felt a light flutter pulse that was weak, but he thought it was a pulse nonetheless. But because he wasn't 100 percent sure, he went ahead and began compressions. Did he say he felt that pulse before he started his CPR? When he first cut him down, he felt a pulse. And then also during CPR, Your Honor, he felt a pulse, both when they were doing compressions and when they were not. And if you look at his — So when Spitzer said, well, that's because you're doing CPR. Right. He — there's evidence in this record that he thought he felt a pulse before the CPR. Yes. And then Mrs. Van Ness says, when the deputy Spitzer says, you're only feeling compressions because — or you're only feeling a pulse because you're doing compressions, she said, but I'm feeling a pulse even when we didn't do compressions. But that's the second time. Right. Judge Anderson said there's two times. Right. And we've identified both times. Right. Correct. And if you look at Mr. Timpson's deposition, he confirms that, that they would when they were doing CPR, they would start taking a pulse while doing compressions, but then when they would stop doing compressions, he would feel a weak pulse. And that's why they did not stop doing compressions, because they were concerned, this person, that Anthony did not have a return of spontaneous circulation. So they felt they could not stop. Can you address the elephant in the room in this case, which is the clearly established law? Yes. There's plenty of law about conduct in a custodial setting, which is jails usually. And I suppose the argument you're making is this was also a custodial setting because this officer's picture took just as much control of the environment as people in the jail would have. So that would be one argument. I suppose the second argument is that, okay, outside the jail there has to be a plus, and certainly there's 11 circuit authorities suggesting a plus. Right, the plus being the arbitrary. So let's focus on the plus. Okay. I can see two possible pluses, and I wonder if you have others or if you agree or disagree. One plus would be a reckless standard rather than simply a gross negligence standard or an indifference standard, a reckless indifference, or I guess the other plus there would be to go beyond that to say some kind of intentional. The second plus I can see would be the certitude required of the injury, that is that it simply has to be more certain that if you don't do something or do do something that there's going to be bad things happening. That certitude plus seems to be supported by some 11 circuit cases, Waddell, Davis v. Carter, and Hill. And arguably it does. Having said all of that. Pardon? Having said all that, do you think a plus has to be shown when it's not in a custodial setting or not in a jail setting, and what do you think that plus is? Yes. I think the plus is it needs to be either arbitrary and conscious shocking. But there's a couple different ways you can establish clearly established law, but only two of them apply in this case. The first one is that there would be a general principle stated in the case law that would give fair warning to government officials in this position that what they were doing was a constitutional violation. And then the other way would be the conduct is so egregious and so out of the realm of reasonableness that you don't need case law to tell you that cutting off somebody's CPR is going to cause them that substantial risk of serious injury. Or almost the certainty of substantial serious bodily injury. And so we think this case fits into either one, primarily the egregiousness standard, because we think we meet the shocking, the conscience standard to establish that there was a constitutional violation in the first place. And as this Court said in Gilmore, it can — the Court can, when determining whether there is a constitutional violation, can look to the sister courts. And that's why we cited to you the Roth's opinion out of the Seventh Circuit and the Middle District's opinion in Olson, because those cases are also every bit as factually similar as the Hamilton case. And I want to address the Hamilton case briefly before — because I think there's a couple problems with the Hamilton case. First off, the Hamilton case came out in — before — I mean, sorry, after the Collins case. And in White v. Lemax, the Court acknowledged that that special danger, special relationship test is no longer valid after Collins. And so — I understand that Hamilton was analyzed on the basis of a different standard that was prevailing then. But it seems to me that the fact that the factual situation is so similar, and what we're talking about at the bottom line is what would every reasonable officer know. Right. And our case law says that what every reasonable officer would know is informed by our decisions. So I don't think — in other words, assume officers get training along this line, and their training would include Hamilton. And Hamilton's decision is very clear. I read before that reckless rescue attempt or reckless interference with the bystander's rescue attempt is not clearly established violation of substantive due process. Well — Would that not inform what standard, what standard of culpability would have to be proved in this case? I don't think so, Your Honor, for a couple reasons. Number one is because the law in this circuit seems to have evolved. And it's evolved to the point where — and it may be because of that special relationships, special damages test — it seems to have evolved into the situation where in noncustodial cases, what we're looking for is arbitrary or conscious shocking behavior. Then in Waddell, the Court said, well, you know, deliberate indifference of the extreme risk of a serious injury or death could also give rise. But they said that at the very least. And so they were saying that's the lowest bar, and that in that case, the facts wouldn't even get over that bar. Then subsequently, in Doe v. Bratty, this Court said, well, no, we're buying into this consciousness or the — shocks the conscience and arbitrary test, which is sort of what Judge Ebel was getting at, is that it's recklessness plus. And in this case, we think we have recklessness plus for precisely the reasons that some of you pointed out. Let's assume, arguendo, you've got lots of evidence of recklessness. You've got evidence that it shocks the conscience. You've got some case law, not a whole lot in the noncustodial setting, but we've applied substantive due process in the noncustodial setting. But I come back to the issue raised by Judge Anderson that I need help with. The question here when we ask whether the law was clearly established is whether it fairly would have put this officer on notice, that what he was doing violates the Constitution, whether it's substantive due process, excess of force under the Fourth Amendment. You've got to notify him. There's this great fiction in the law where we impute to the officer a detailed analysis of the case law. That's our law. There are sound reasons for doing it. But I'm concerned that maybe we're going a little far here when we're saying we expect this officer who we presume to have read Hamilton would have been able to distinguish Hamilton on the grounds that you suggest. One, we're no longer using special danger test. But factually, it's pretty close. I think there are factual differences. He stops the CPR in Hamilton and then allows it to come back when the woman comes back with the CPR. Presumably, he touched the woman himself, whereas in this case, we accept the facts that the defendant did not touch, do, or say anything other than on multiple occasions keep all help away in the face of grievous risk and danger. But if you read Hamilton, could not an officer say, You know, it's close. I'm not sure. Maybe six one way, half a dozen the other. And if that's the case, how would it have clearly put the officer on notice that he couldn't do what he did here? Oh, well, we're not relying on Hamilton to say the law is clearly established. And we certainly — and neither did Judge Korrigan, the district court judge. No, you're looking at it as an obvious clarity case. I understand that. But the point that Judge Anderson is making, and if you're not looking at it as an obvious clarity case, then I'm not sure how we're looking at it because we got a case that's factually real close. There are distinctions, which we've pointed out, but it's close. Noncustodial, CPR, comes out of a pool, drowning, and the officer says, Stay away. Leave the victim alone. And that passes constitutional muster. How do we get around that and say the officer clearly was put on notice that what he did here violated the Constitution? Well, okay, there's two things I have to say about that. Number one is, you're right, there are some very distinguishable facts. Hamilton actually rolled her eyes at one point. He did assess her. He tried to find a pulse on her. He believed the paramedics were one minute away. They got lost. There were some issues with that. But I also think because the whole analysis of that case, as I read it, turned entirely on the fact that the police officer did not specifically put Hamilton in peril. He didn't throw her in the pool. You know, he came along when somebody was doing CPR. She appeared to be rallying, I guess, as part of the issue here, so he felt safe in saying, Let's just wait for the paramedics. Didn't he put her in peril by stopping the CPR when we know as a medical fact that the one thing you cannot do is stop the CPR? Yeah, I mean, it's a difficult case. Doesn't that put her in peril, and didn't he put her in peril by doing that? Well, I mean, the argument in that case was not necessarily because she did have signs of being coming back after the CPR was initially begun, that she was rolling her eyes. She apparently answered, not answered verbally to her name, but she answered with cues that she understood that somebody was talking to her. That is far distinguishable from Anthony's situation. But that makes the case even harder for you. Why? Because there was even less excuse for the Officer Duncan there to quit when there were more signs of life than there are here. Not if he believed that her pulse was sufficiently strong that they didn't need to do compressions any longer. He would have a subjective understanding at that point, or belief, that the risk was not as severe as the risk in our case. Anthony never really showed any signs of rallying, and everybody kept telling him, we feel a weak pulse, but that's why we need to do CPR and we need to do this. And he had had CPR training just two years before this incident. So he would have been told, as the internal investigation told him, he would have heard at that CPR training, you never stop CPR until either the people become overly exhausted and can't continue or the paramedics and some qualified medical personnel arrives. Is there any other distinction between Hamilton and this that would make it clear that he would be on notice, he can't do what he did? Well, I have a problem with Hamilton because I think in part it may be bad law. It came out after Collins, and it was still applying a test that Collins did away with. And so I'm wondering if it just wasn't good law to begin with. But that's a whole different issue. So officers are supposed to know more than judges? No, Your Honor, and I recognize that. But it's – I think the case is not – I understand where you're coming from in thinking that it's helpful here and that if he had read this, but at the same time, if he'd read the subsequent case law like Waddell and Doe and the other noncustodial cases, he would have had to come to a different conclusion. The problem with those cases is that they're factually really different from what you have here. This is noncustodial stopping CPR. Hamilton was noncustodial stopping CPR. Waddell, Doe, those are factually demonstrably different from this case. I'm just looking for your help here because this is a terrible tragedy, and there's plenty of evidence that the conduct here shocks the conscience. Right. There's certainly plenty of that. I just don't know how to get around a cop who read Hamilton wouldn't come away with the sense that maybe I can do this. I don't know. I think that would seem a little hard for him to justify, given the fact – and I understand he's not a legal scholar, but, I mean, I think that you're dealing with a situation where there was this strange test of special relationship and special danger that basically exonerated an officer if the officer didn't put the person in the situation to require the rescue. And that no longer applies here. And so here we have a situation where – So your answer is he would have to be – if we're going to impute Hamilton, we're going to impute as well the subsequent law which made that clear. Right. Absolutely. Right? Let me ask you this. Just assume for the purposes of this question, and I think it's clear this is a hard case and we're not at all sure, but assume for the purposes of this question that because of Hamilton, it cannot be clearly established in this circuit unless it is more than a reckless rescue attempt or interference with a bystander's rescue attempt. Suppose it cannot be clearly established in this circuit unless the plaintiff can prove more than that. Is there any level of culpability between that recklessness and intent to cause harm? Yes. One of the cases – I'm sorry, I'm not calling out the name right now, but there was a case that talked about that distinction between recklessness or even mere negligence and intentional harm. And they said, well, you know, those two poles are easy. If it's negligence, qualified immunity. If it's intent to harm, no qualified immunity. But it's the closer case in the middle that is so difficult. But I'm asking that question because it seems to me the Supreme Court's Lewis decision suggests that the next level of culpability up from recklessness is intent to cause harm. I didn't see it as going quite that far. I think it's saying that's clear if there's an intent and you can show an absolute intent to cause harm, yes. But we can also assume some subjective motives based on the obviousness of the problem, right? So here it's so obvious that if this kid does not get CPR, he's either going to have a severe brain injury or he's going to die. Can a jury here on this fact pattern taking every fact in your favor, drawing every inference in your favor, fairly conclude that this officer intended the harm that befell this boy? I would say yes. I mean, he's trained in CPR. He knows the rules about CPR. He was an EMT. I mean, to tell you the truth, I can't wrap my head around it. I don't understand why he would do this. Like, who would do this? It's not reasonable. Well, he says he didn't do it, but let's assume that he did do it. Isn't the only plausible explanation that he screwed up, he wanted to control the scene, he acted precipitously, he acted quickly, he acted recklessly, but the last thing in his mind was to see this boy die? I think, I mean, this is what's interesting between the interplay between Waddell and Doe, right? Because in Waddell it said, you know, at least a reckless disregard of the extreme risk of serious injury. And then in Doe it seemed to me as though, and then they said, oh, it could be higher. It could be a substantial certainty of injury, and that would be enough to deny qualified immunity. Your argument boils down to this. Given what he knew, he had to know that the boy would certainly die if there was no CPR. Either certainly die or suffer a substantial brain injury. Grieve his brain injury. Let me ask the final question from me, at least this way. What clearly established law would have put this officer on notice? Or is it your argument that you don't need a case on point because this is an obvious clarity case? Well, I would start out with the obvious clarity, but also I think that because of the way he took control of the scene, and because he did it in a way that he admitted that had no law enforcement purpose, either to, you know, stop the CPR or try and put the crime scene over the victim's life, all those 14th and 8th Amendment cases are sufficiently analogous. And in Hope, the Supreme Court said we don't need materially and fundamentally similar facts. In fact, we can have clearly established law, even under very novel factual circumstances. Right, but is that up because it's a novice? Are you arguing this is like Levy-Ferraro? You know the case I'm talking about? Yes. Cop busts woman for honking horn downtown Miami, pulls her out of the car, cuffs her. There's no risk of flight, no danger. And then he takes her to the back of the car and smashes her head against the trunk. We hold unambiguously he couldn't do it. We don't need a case on point. No sentient police officer could believe that he could do that. Is that what this case is? That's what I think this case is. And I think there's sufficient evidence of that fact here because of his training, because of what common sense is with CPR. You just have to watch one ER or law and order, and you know that once you start the CPR, you don't stop until somebody with authority declares him dead. And, I mean, he did not have that authority to begin with. So, yes, we think that this is a case that definitely ---- Let me ask you this question. Okay. If you had to articulate a level of culpability between the recklessness, one I've been quoting out of Hamilton, and intent to cause harm that I get from Lewis, would you try to articulate such a level of culpability? I would say it is the substantial certainty of the risk of serious medical injury or personal injury or death. And it's the substantial certainty. It's like you know ---- It would have to be knowledge of or awareness of such a substantial certainty, would it not? Yes, but we can assume that based on the obviousness of the risk. And is that any different from intent to cause harm? I guess you could make an argument that they're not different. Sure sounds like intent to me. It sounds like intent to me. I mean, I just, you know ---- The argument really, when we cut to the chase, there was intent here. Yes. Why? Who knows? Motive is unclear, but intent is clear. Yes. That's your argument. Pretty much, yes. Thank you. We would ask that you affirm the district court's decision. Thank you. Thank you very much. Mr. Palmer, five minutes. Thank you. Deputy Spudger went to this scene and did not have any fair notice from the case law that he is presumed to know about that what he was doing was unconstitutional. But the plaintiff here is arguing not just the case law, but the obviousness of the unconstitutionality. I'll address that. Yes. Yes, Your Honor. But I need to talk about Hamilton first. All right. Go ahead. I'm sorry. You go ahead. Yes, Your Honor. In Hamilton, we've got facts very, very similar to this guy's. In Hamilton, this court stated it would take much creativity and imagination to glean from the factually distinguishable cases upon which the plaintiffs rely a clearly established rule of law that an unsuccessful, negligent or reckless rescue attempt or interference with a bystander's rescue attempt amounts to a constitutional violation. That's what this court said in 1996. That reasoning stands even today for purposes of an analysis of whether this officer had qualified immunity. With regard to obvious clarity, this court in 1996 in Hamilton said nothing about obvious clarity. This court did not base its decision on the fact. Right. The law changed. But the point is that the law changed substantially after that and before the conduct at issue in this case. And he didn't need to address obvious clarity because the court there had an easier way to get rid of this, that case there, in that it wasn't State-created danger. And so in that test, that easy out isn't available anymore. That diminishes the precedent there because the court relied on, for its holding, a fairly clear exception to liability, which isn't available anymore. But any reasonable officer in the position of Deputy Spocher, knowing what he knew at the time, could not read Hamilton and come away with it that what he was doing was unconstitutional. Hamilton is just so close to this case factually. But what about all the cases after Hamilton? There are other cases that have been cited by the district court. We have Waddell, Davis, Hill, Doe. Those cases involve much more egregious situations. Well, so then that comes down to, your very answer says, then the test comes down to egregiousness. And because this is on summary judgment, how egregious could a jury find this when the test is a balancing test? The risk of going forward with CPR versus the danger of not going forward. I mean, it's not that he was beating the guy overhead with a skillet or something. But on the balancing test, you've got a risk if you don't do something that is just horrific compared to almost no risk of continuing the CPR. So to me, the obviousness has to be on how far the teeter-totter is tilted. And there's really no weight on the argument for stopping CPR. And there's tremendous weight on the other side. Even if you assume a constitutional violation, in this circuit, Deputy Speicher would still be entitled to qualified immunity if the law was not clearly established. Our position is, reading Hamilton, it was not clearly established. And it's not obvious clarity by taking egregious situations in custodial cases and trying to apply it and impute it. What he knew by background and training could not a reasonable jury infer that he acted intentionally. He faced an obvious, profound, and grievous risk of either death or extraordinary harm if CPR was stopped. He knew that, or at least there's enough evidence from which a jury could find that. And yet he said no, not once, not twice. But even when the EMT truck came, he allowed only one EMT driver to come up and kept the others away. Even assuming arguendo, he read Hamilton and he concluded that negligence wasn't enough, recklessness wasn't enough, wouldn't he have to know that he couldn't act intentionally in this way? I don't know what the motive is. I mean, it may be it never happened. And a jury might believe your client who says, I didn't proceed that way. I checked him myself and came away with the conclusion. But I have to accept the facts at this point the way the plaintiff has presented them. And, Your Honor, with merit. Why isn't that an obvious clarity case? Not that there's a case on point, but it had to be clear to any sentient officer that he couldn't proceed this way. Your Honor, one can make the same argument for the deputy in Hamilton. I mean, the deputy in Hamilton could arguably have known that by ceasing CPR, there was a risk of harm. Yet in Hamilton, this very court determined that the deputy, in fact, had qualified immunity. And with regard to this whole issue about whether or not Deputy Schweitzer intended to harm this child by temporarily stopping CPR, this has never been alleged. I don't have the complaint. I don't even think it's anywhere in the complaint. It's certainly not been raised by the appellee in their briefs that somehow this deputy, for whatever reason, just intended to harm this child. Would it not be actually up to you to raise it? In other words, it is a defense of yours that, no, even if this is reckless, it doesn't rise to the level. It was up to you to raise it. Was it not? It's your affirmative defense. It's your defense of qualified immunity. It's your burden. Well, with regard to the qualified immunity analysis, after the defendant established that he was acting within his discretionary authority, the burden shifts to the appellee to determine that qualified immunity is not affordable to this deputy. And I still contend that even if Deputy Schweitzer's actions were deemed unconstitutional, he is entitled to qualified immunity on the plaintiff's 1983 due process claim because the law was not clearly established so as to put him on notice that what he was doing was unconstitutional. And furthermore, I believe that the in-custody cases do not provide obvious clarity despite sure that his actions were unconstitutional. One final thing, just in response to something that Counsel for Appellee argued. They've argued that a couple of cases would have placed the deputy on notice. One is the Ross case. I believe that's a Seventh Circuit case. Another one was Olson, which is a Middle District of Florida case. It is important to note that it is clear in the Eleventh Circuit that for purposes of a qualified immunity analysis, those cases that would have placed the deputy on notice must come from the Eleventh Circuit, the United States Supreme Court, or the highest court of the state of Florida. Ross being from the Seventh Circuit and a Middle District case would not have provided the requisite notice and clearly established for purposes of a qualified immunity analysis that what Deputy Schweitzer was doing was unconstitutional at the time. So, Your Honor, I would ask that the court reverse the district court's denial of summary judgment based upon our arguments. Thank you. If you have any other questions. Thank you very much. The court will be in recess until tomorrow morning.